IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2005

## STATE OF TENNESSEE v. AL M. WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-12970      Joseph B. Dailey, Judge**

_____

**No. W2004-01679-CCA-R3-CD  - Filed January 30, 2006**

_____

The defendant was convicted of attempted second degree murder and sentenced as a Range II, multiple offender to confinement for nineteen years to be served consecutively to two prior sentences. In his appeal, he argues that the trial court erred in allowing hearsay testimony as to the desire of one of the witnesses, prior to the incident, to leave the house where the offense occurred, and that the evidence is insufficient to sustain the conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

John Candy, Memphis, Tennessee, for the appellant, Al M. Williams.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Terry Don DeShields, the victim, testified that he was twenty-five years old and that, on September 26, 1998, he had been at the house of his cousin, Mario Collins, at 3018 Chelsea Avenue in Memphis. The night before, the victim and the defendant had a "confrontation" at the residence. At "11:00/12:00 o'clock that morning," the defendant got into an argument with a woman who was at the house with him, because she wanted to leave. The victim explained that he and the defendant got into a "tussle":

> A       Basically, it really was about that he wouldn't calm down after we ended up letting her leave. He was . . . kind of upset about it. And he wouldn't calm down, and we ended up tussling – he ended up ripping the chain off my neck.

Q        Okay. You said, "We ended up tussling." Describe to the jury what you were tussling – what it was.

A        Basically I was trying to hold him down as my brother let her out. I was trying to hold him down. He wouldn't calm down. And . . . I don't know what it was, but he just wouldn't calm down. And in the middle of the tussling, he ended up yanking my chain off my neck.

The victim said that he "punched" the defendant "a quick couple of times" and the defendant struck him "[i]n the face one time." The victim's brother broke up the fight and the defendant then stayed in a back room for "about an hour" until Collins returned with the defendant's truck. After Collins had come into the house, he went to the rear, where the defendant was, and apparently spoke with him, according to the victim:

And he went to the back, and I guess he talked to [the defendant], and [the defendant] came back to the front room; and, you know, he apologized about . . . how he was acting, and he apologized for breaking my necklace, and he told me that morning we were going to go get it fixed or we were going to get another one.

The defendant's apology was made at about 2:00 a.m., and, at the time, he seemed to be "fine" to the victim, who accepted the apology. The victim continued to sit on the couch and the defendant returned to "his bedroom." The victim fell asleep on the couch and was awakened as Collins was talking with the defendant, who was coming back into the house. The victim remembered the defendant then standing over him:

The next thing I can remember is that I could feel somebody standing over me. You know how you just be so sleepy . . . you don't wake up, you don't think of things, but you just feel certain things or like certain people walking past you and stuff. But I could feel somebody standing over me. And the next thing, you know, . . . I could hear [Collins] asking him what he was standing over me for.

The victim heard the defendant say, "You'll never put your hands on me again," and felt something hit him in the head causing him to "blank[] out for a minute." Next, he heard "people hollering and people moving," telling him that he had been shot. He said that he had done nothing to provoke the defendant "[u]nless it was pertaining to what happened earlier that night." The victim said that he "couldn't get up." The next thing the victim remembered was "being hauled outside on a stretcher." He said that he had not been able to move his legs since that night, but he could "move [his] toes a little bit." He was hospitalized at The Med for "a month/month and a half" and was then transferred to Baptist Hospital, where he remained for two months. He told police officers that he had been hit in the head and shot by the defendant.

On cross-examination, the victim said that he had known the defendant for "a good couple of months" before the shooting and "kind of looked up to him."

Roderick McNairy, the victim's brother, testified that he was with the victim on September 26, 1998, at his grandmother's house, which Collins rented. He said that he, Collins, the victim, and the defendant spent the night before the shooting at the residence. The trouble between the victim and the defendant started around 9:00 or 10:00 p.m. when the defendant "had a little friend over there with him that . . . [was] supposed to have been his little playmate." McNairy said the fight "started from the female friend that he had over. And she wanted to leave the house, but [the defendant] wouldn't let her leave . . . because . . . she said she wasn't going on oral sex, I guess, to his perfection." McNairy said that the woman "was crying and scared" and the defendant was "very angry." The victim tried to calm the defendant down and "some kind of way [the defendant] ended up breaking [the victim's] necklace." As McNairy was holding the victim, the defendant was "constantly trying to get" at the victim. Eventually, the defendant apologized to the victim, but McNairy did not "think he meant it." The defendant and the victim agreed to get the necklace repaired. McNairy fell asleep and explained he was awakened by a gunshot and saw that the victim had been wounded:

> That morning – well, the morning I remember, I was asleep, and I just heard a gunshot. And when I . . . woke up – Terry, my brother, is lying beside me. I'm in the reclining chair. [The defendant] was standing right there in front of me with a gun in his hand.

McNairy saw the defendant pointing a pistol at the victim, who still was asleep on the couch. According to McNairy, the defendant said, "'Look at what you made me do.' And he grabbed – there was a liquor bottle on the table. He grabbed it and ran out the door." Collins pulled the covers from the victim, raised his shirt, and they saw "a little dot right up under his arm, and [they] knew he had been shot." McNairy ran across the street to call an ambulance and then returned to the victim, who said he "couldn't feel his legs."

Lieutenant William Bolner of the Memphis Police Department testified that the victim had already been transported to The Med when he arrived on the scene. The witnesses named the defendant and said that he was responsible for the shooting.

Kimberly Tanzy testified that she was the keeper of the records for Division V of the Shelby County Criminal Court and that, according to the records, the defendant came into the custody of the State of Tennessee on February 26, 2002, after being extradited from Arkansas.

The defendant testified that on the day of the shooting, he was living in the house where it occurred. He said that the victim came to the house "all the time" and that the victim "had a gun every time" he came. The defendant said that, on the day of the incident, the victim and his brother were "messing with" an "old lady named [M]om," who had come "to pick up something." The defendant, the victim, and his brother all had been drinking and smoking marijuana. After the defendant had instructed the two of them to "leave that lady alone," they pushed her out the door. In response to the defendant's complaints about how he was treating the older woman, the victim said, "Fuck that, I'll do it to you." Then, the victim struck the defendant, who hit him back, and the

victim's brother broke up the fight. The defendant described how he and the victim began fighting again:

> A  We was [sic] sitting there. Me and him was [sic] still, you know, arguing, off and on. And I got up to get something else to drink, and he said, "You try to drink up everything." And then I came back in there and stepped back down; and I had sat on the end of the couch by him, and he said, "Man, get your ass up," just like that. And I got up. And at that time, that's when . . . [the victim] struck me again.
>
> Q  All right. Then what happened?
>
> A  He kept striking me. He kicked me in the stomach and the head – kicked me and just pretty much, . . . he had his way with me.

As they were fighting, the victim's brother pulled out a gun and displayed it to the defendant, who stepped back and allowed the victim to continue hitting him. They then sat back down and began watching television again. The defendant told the victim that he would repair the victim's necklace which had been broken during the fight. The defendant got up from the couch, someone came to the door, and the victim struck the defendant again, telling him to sit down.

Subsequently, the defendant went to a bedroom and went to sleep. He arose the next morning and ironed his clothes to go to the barbershop. He needed gas money for his truck, so he asked Collins for $10. As the defendant was about to leave the house, the victim challenged him:

> Yeah. He jumped up and said, "Where in the hell do you think you're going; and I don't know where in the hell you think you're going." I said, "Man, I got to work if you want me to pay you your money, man," just like that. And he was like, "You ain't going nowhere. He retch [sic] up the keys, and at that point, I reached back and got a bottle off of the table. He rushed in going towards the livingroom where the gun was.

The defendant said that the victim retrieved a pistol from underneath the couch and the defendant "grabbed part of it." He explained how the victim was shot:

> I'm around the other side almost up under him like, but he was going this way, and I came around like up under like, and I could see the gun because I could see it when he spin [sic] it. Finally I grabbed it – got my hands onto it. He had his hands onto the other end. I snatched it real hard, and the gun went off, and I helped him down to the – laid him down on the couch; and I said, "Oh, man, look what you made me do." And at that time, I exited the house and went and threw the gun[.]

The victim's brother then told the defendant to leave the house, which he did. The defendant said that he "threw the gun in the bushes right out in front of the house" and that he left because he was on parole and was not supposed to be in Memphis or be around a weapon.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant argues that the evidence was sufficient for the jury to find him guilty of attempted voluntary manslaughter, but not of attempted second degree murder.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the time this crime was committed in 1998, second degree murder was defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). The Sentencing Commission Comments note that this section "should always be read in conjunction with the first degree murder, voluntary manslaughter and criminally negligent homicide statutes." Id., Sentencing

Commission Cmts. Both second degree murder and voluntary manslaughter are "knowing" killings. Voluntary manslaughter is a lesser-included crime of second degree murder that involves the mitigating elements of the defendant's "state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). It was a question for the jury whether the defendant's acts were a "knowing" attempt to commit second degree murder or whether he was acting under "adequate provocation." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

At the trial of this matter, the defendant asserted facts which were the opposite of the State's witnesses. It is obvious that the jury believed the State's witnesses and disbelieved the defendant, as was its right. The testimony of the State's witnesses easily established the elements of attempted murder second degree. Accordingly, this assignment is without merit.

## II. Erroneous Evidentiary Ruling

The defendant argues that the trial court erred in allowing the victim to testify, during direct examination, as to why he and the defendant began arguing, asserting that it was "classic hearsay." The testimony as to which the defendant complains arose during the following series of questions by the State:

Q      What led up to you getting shot?

A      Me and [the defendant], we had a confrontation like that night before. Both of us, we had been smoking. And, . . . [the defendant] had been drinking heavily, and we got into a confrontation that he had a lady in the back room of [Collins'] home, and they got into an argument, and he asked her to leave.

Q      I'm sorry to stop you, but who got into an argument?

A      [The defendant] and the lady that he had over.

Q      Was [the defendant] living at the house?

A      No.

Q      Did he stay there that night?

A      Yes, sir.

Q      About what time was it that this happened – this argument?

A      This argument had to happen at around 11:00/12:00 o'clock that morning.

Q Is this the argument with the girl that [the defendant] had?

A Yes, sir.

Q And what was it that got you to arguing?

A That she wanted to leave –

[Defense Counsel]:  Objection, Judge.

THE COURT:  Why don't you all approach[?]

In response to the defendant's claim that the victim's responding to this question would be hearsay, the State argued that the response would be "[n]ot for the truth of the matter asserted but that she wanted to leave and that basically [the victim] was standing up for her and letting her leave, but the defendant wasn't going to let her leave."  The trial court overruled the defendant's objection, concluding that the evidence was not hearsay but "more offered to explain why these hard feelings existed that led to the fight rather than whether or not one person really wanted to keep her there and one really wanted her to leave."

After the trial court had overruled the defendant's objection to the victim's testifying as to why he and the defendant were arguing, and the victim was allowed to complete his response, he gave a somewhat different explanation as to how the fight began:

Q Did you, in fact, get into a fight with [the defendant]?

A Yes, sir.  Most likely a tussle.

Q Was it over this girl that he had over?

A Basically, it really was about that he wouldn't calm down after we ended up letting her leave.  He was . . . kind of upset about it.  And he wouldn't calm down, and we ended up tussling – he ended up ripping the chain off my neck.

Hearsay is defined as  "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay.  Tenn. R. Evid. 802.  "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court."  State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001).  As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion.  Id.

First, we note that the victim was not asked to relate statements of the defendant or the woman with whom he was arguing, but, instead, as we view the question, why the victim and the defendant began arguing. His response, made after the defendant's objection had been overruled, was that he and the defendant had "tussled" because the defendant "wouldn't calm down" after the woman left. The defendant was "kind of upset about it." As such, we conclude that the victim was not required to, and in fact did not, testify as to hearsay by responding to the question. Even if it were hearsay, it would be admissible to explain why the argument began between the victim and the defendant. See State v. Williams, 977 S.W.2d 101, 108 (Tenn. 1998) ("[T]he statement was admitted for the purpose of showing the 'bad blood' between the Buchanan family, with which the victim was aligned, and the Williams family, of which the defendant was a member."). Accordingly, we conclude that the trial court did not abuse its discretion by this evidentiary ruling.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE